## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

LILLIAN GUERNSEY, by          :
and through her Conservator,   :
THOMAS ITTERLY,                :      **CIVIL ACTION NO. 3:CV-04-0423**
                               :
          Plaintiff            :      Magistrate Judge Blewitt
                               :
          v.                   :
                               :
COUNTRY LIVING PERSONAL CARE   :
HOME(S), INC., et al.,         :
                               :
          Defendants           :

### MEMORANDUM

### I. Background

Plaintiff, Lillian Guernsey by and through her Conservator, Thomas Itterly, her son,[1] has

brought this tort action against the Defendants alleging negligence due to the sexual assault of

Plaintiff, a resident at Defendants' nursing home, by Daniel Statham, a fellow resident at the nursing

home.[2]

---

[1]We shall refer to Lillian Guernsey as Plaintiff herein.

[2]Jurisdiction of this Court is based on diversity pursuant to 28 U.S.C. § 1332(a)(1), despite
the fact that at the time of the sexual assault all parties were Pennsylvania residents.  At the time
this action was filed, Plaintiff was a resident of Tennessee.  *See Jones v. Law Firm of Hill &
Ponton*, 141 F. Supp.2d 1349 (M.D. Fla. 2001) (diversity jurisdiction is determined when the
case is filed and not when the cause of action arose); *McDonald v. Equitable Life Ins. Co. of
Iowa*, 13 F. Supp.2d 1279 (M.D. Ala. 1998).

The District Court, in its October 26, 2005 Memorandum, stated the following factual

background of this case when it ruled on Defendants' Motion for Partial Summary Judgment:

> Before the court for disposition is the defendants' motion for
> partial summary judgment. The plaintiff is Lillian Guernsey by
> and through her Conservator, Thomas Itterley, ("Guernsey" or
> "plaintiff") and the defendants are Country Living Personal Care
> Home(s), Inc., Shirley D. Sheridan a/k/a Shirley D. Sherridan and
> Shirley D. Sheridan a/k/a Shirley D. Sherridan d/b/a Country Living
> Personal Care Home (collectively referred to as "Country Living"
> or "defendants"). Guernsey has brought suit to recover damages for
> a sexual assault that she alleges took place at Country Living while
> she was a resident there. The matter has been fully briefed and is
> ripe for disposition.
>
> **Background**
>
> The basic background facts are undisputed by the parties.
> Defendant Country Living is a Pennsylvania corporation with the designated
> purpose of operating a personal care home. The home is located in
> Nicholson, Wyoming County, Pennsylvania, and its sole owner is
> Defendant Shirley Sheridan. (Pl. Ex. A, Sheridan Dep. at 17). The home
> first opened in October of 2001 with Laura Wickizer as the
> designated administrator. (Pl. Ex. C, Wickizer Dep. at 24, 31). Wickizer
> is licensed by the Pennsylvania Department of Public Welfare as a
> personal care home administrator. (Pl. Ex. C, Wickizer Dep. at 13).
> Plaintiff Lillian Guernsey was a resident of Country Living in
> Nicholson, Pennsylvania. At the relevant time, she was eighty-six years
> of age, and had suffered from moderate dementia since at least August
> 2000. Beginning on October 26, 2001, Daniel Statham also resided at
> Country Living. Statham, a thirty-one year old man, was on probation
> [as a Megan's Law violator] after serving [his maximum sentence] six years
> in prison for aggravated indecent assault.   Statham is mentally retarded.
> (Pl. Ex. C, Wickizer Dep. at 27-28). He was on probation for six
> months for failing to provide his probation office with an address
> in violation of "Megan's Law." (Def. Ex. L, Moser Dep. at 33-34, 43).
> Statham moved into the facility in October of 2001. On February
> 27, 2002, he sexually assaulted Plaintiff Guernsey.
>
> Subsequently, plaintiff filed the instant complaint [Doc. 1]
> alleging the following four counts: 1) Negligence (against all defendants)

2

in, *inter alia,* failing to protect the plaintiff and properly supervise her
and Statham, 2) Negligence against Shirley Sheridan individually;
3) Negligence, vicarious liability, against all defendants; and 4) Negligence,
independent liability, against the businesses. (*See* Doc. 1, Compl.)
Plaintiff seeks both compensatory and punitive damages. Defendants
have moved for partial summary judgment. They seek judgment on the
punitive damages claim and the independent liability claim against
the businesses.

(Doc. 82, pp. 1-3). *See also* 2005 WL 2787057 * 1 (M.D. Pa. 2005).

The District Court then granted in part and denied in part Defendants' Summary Judgment

Motion.  The Court held as follows:

It [Defendants' Summary Judgment Motion] will be
denied with respect to punitive damages and granted with
respect to corporate negligence. Therefore, remaining in the case
are plaintiff's claims for: 1) Negligence (against all defendants) in,
*inter alia,* failing to protect the plaintiff and properly supervise her
and Statham, 2) Negligence against Shirley Sheridan individually;
and 3) Negligence, vicarious liability, against all defendants. In
addition, the punitive damages claim remains in each count.

(*Id.*, p. 9 & * 4).

Subsequently, the parties consented to proceed before the undersigned for a non-jury trial

pursuant to 28 U.S.C. § 636(c).

On February 26, 2006, this Court commenced a non-jury trial in this case.  The trial

concluded on March 1, 2006.  At the conclusion of the trial, we issued an Order directing the

parties to submit supplemental findings of fact and conclusions of law.  Following an extension of

time granted by the Court, the parties submitted their Supplemental Findings of Fact and

Conclusions of Law.  (Docs. 142 & 143).

3

At the outset, we note that at trial, Defendants conceded liability in this case.   This concession came during the testimony of Defendant Shirley Sheridan in which she essentially admitted negligence on her part and on the part of Country Living.  Indeed, at the conclusion of Plaintiff's case-in-chief on March 1, 2006, Plaintiff moved for a directed verdict regarding the liability of Shirley Sheridan and Country Living Personal Care Home, Inc. ("Home" or "Country Living Home"), and Defendants had no objection to said motion.  The Court then granted Plaintiff's motion for a directed verdict regarding the liability of the stated Defendants.  Moreover, in their recently filed Supplemental Conclusions of Law, Defendants state that they have admitted negligence.  (Doc. 143, p. 13, ¶ 1., Supplemental Conclusions of Law).

Accordingly, we shall limit our discussion with respect to our findings of facts and conclusions of law regarding liability in this case, and we shall focus our findings and conclusions largely on  the issues of compensatory and punitive damages.

For the following reasons, and based on the evidence presented before us at trial, we find that compensatory damages in the total amount of $300,000.00 and punitive damages in the total amount of $800,000.00, on the remaining aforementioned claims, are appropriate in this case.

## II. Findings of Fact

We have made the following findings of fact pursuant to Fed. R. Civ. P. 52(a).[3]

Initially, we adopt all of the following facts as submitted by both parties in their Joint Statement of Facts:

---

[3]Upon completion of the trial, the Court directed the parties to submit supplemental findings of fact and conclusions of law based on the transcript.  Both parties, as stated, filed their supplemental documents, and we have reviewed them.

4

1.  The Defendant, Country Living Personal Care Home is a Pennsylvania Corporation licensed to conduct business in the Commonwealth of Pennsylvania as a personal care home.

2.  The sole shareholder of Country Living Personal Care Home since its opening in October of 2001 is the Defendant Shirley D. Sheridan.

3.  The Plaintiff Lillian Guernsey was born on September 19, 1915.

4.  Lillian Guernsey had been a resident of Country Living Personal Care Home since October 2, 2001, after having been transferred from Hilltop Estates, which was another personal care home.

5.  Daniel Statham was born on August 6, 1970.

6.  On August 10, 1995, Statham was sentenced to three to six years in a state correctional facility for aggravated, indecent assault.

7.  On October 15, 2001, Statham was transported to Omni One Personal Care Home, owned by Shirley Hein, the mother of Shirley Sheridan, by the Northumberland County Sheriff's department.  Omni One had previously agreed to accept Statham as a resident.

8.  On October 26, 2001, Daniel Statham was transferred to the Country Living Personal Care Home by Shirley Sheridan.

9.  On February 27, 2002, Daniel Statham raped Lillian Guernsey in her room while both individuals were residents at the Country Living Personal Care Home.

(Doc. 118, ¶'s 1.-9.).

5

We also find the following facts as supported by credible testimony adduced at trial and as specified in Plaintiff's Supplemental Findings of Fact:

10. Christiano testified that she assisted Daniel Statham in attempting to formulate a home plan. (R. at pg. 67, 68). Christiano testified that she recalled that Statham had been released from the State Correctional Institute at Coal Township, that he did not have a home plan, and that he was deemed a Megan's Law offender. Christiano testified that Statham was incarcerated at the Northumberland County Prison because when he was discharged from SCI-Coal Township, he had violated the Megan's Law by not having a home plan, which resulted in Statham being re-arrested and brought to the Northumberland County Prison. (R. at pg. 68).

11. Christiano testified that when an individual has been deemed or designated a Megan's Law offender, they are deemed "a violent sexual predator." (R. at pg. 68).

12. Christiano testified that after steps had been taken to locate a facility for Statham to reside at, all of which were unsuccessful, she contacted the Department of Public Welfare and asked for a list of all available boarding homes in the Commonwealth of Pennsylvania. (R. at pg. 69). She testified that she called 10-12 boarding homes before she finally got a positive response from the one where Mr. Statham was ultimately placed. (R. at pg. 69). There is no dispute in the record that this facility was the Omni One Personal Care Home owned by the mother of [Defendant] Shirley Sheridan.

13. Christiano testified that, with respect to the 10-12 nursing homes that she had contacted about potentially accepting Statham, she had advised those personal care homes that the individual for whom she was seeking placement was currently incarcerated at the Northumberland County

6

Correctional Facility (R. at pg. 70).  Further, Christiano indicated that she had made the disclosure

that the individual was a Megan's Law violator. (R. at pg. 70).  Christiano further testified that she

indicated that the individual had come to the Northumberland County Prison from the State

Correctional Institute at Coal Township (R. at pg. 70, 71).  Christiano further testified that she made

the disclosure to the 10-12 personal care homes that refused to accept Statham that the individual

for whom she was seeking placement had been incarcerated for six years. (R. at pg. 71).

16.  Christiano notified Linda Kamarauskas [of Omni One Personal Care Home] that Statham

had been incarcerated at SCI-Coal Township for six years for rape.  She further explained to

Kamarauskas that Statham had violated Megan's Law. (R. at pg. 72).

17.  It is undisputed that Mary Jo Christiano advised Linda Kamarauskas that Statham's

underlying offense was for rape. (R. at pg. 72).

18.  Linda Kamarauskas advised Christiano that she would talk to her boss and call Christiano

back relative to the potential acceptance of Statham at the Omni One Personal Care Home. (R. at

pg. 73).  Ultimately, Kamarauskas called Christiano back and indicated that Omni One would

accept Daniel Statham. (R. at pg. 73).[4]

21.  Testimony establishes that Linda Kamarauskas was advised by Mary Jo Christiano that

Mr. Statham would have to register as a Megan's Law Offender (R. at pg. 74); Christiano indicated

that she had a specific recollection of notifying Kamarauskas of this fact. (R. at pg. 74).

----

[4]We also find that Kamarauskas contacted Defendant Sheridan to see if she thought
Statham was an appropriate resident for Omni One, even though Omni One was owned by
Sheridan's mother.  Kamarauskas told Defendant Sheridan that Statham had been in jail on a
sex-related offense.  Kamarauskas did not recall Defendant Sheridan's advice, but stated that if
Sheridan told her it was a bad idea to take Statham, she probably would not have taken him.

22.   After Mary Jo Christiano had advised Linda Kamarauskas about Mr. Statham's background and the fact that he would have to register as a Megan's Law Offender, Christiano was never contacted by anyone identifying themselves from either Omni One or any other facility at which Mr. Statham resided. (R. at pg. 75).

23.   Christiano never made any representations to anyone at either Omni One or any other facility as to whether or not Mr. Statham would pose a danger to other residents at the facility where he had been placed. (R. at pg. 75).

25.   Lillian Guernsey was the only female that resided on the second floor of the Country Living Personal Care Home (R. at pg. 110); the other two residents who resided on the second floor were both male, Daniel Statham and Robert Ball. (R. at pg. 110).

26.   At the time Daniel Statham was brought to the Country Living Personal Care Home by Shirley Sheridan, Margaret Mosier Van Wert was not given any information about Mr. Statham's background (R. at pg. 110). [She did not know of Statham's criminal past or conviction.] Margaret Mosier Van Wert was not notified that Statham was transported to the Omni One facility by Sheriff's deputies in handcuffs and shackles. (R. at pg. 110). [Nor did Defendant Sheridan caution Van Wert to be careful around Statham.]

28.   Mosier Van Wert testified that Statham would follow the employees around the facility and would stand outside the bathroom door when she would go into the bathroom. (R. at pg. 111). Mosier Van Wert and other employees were nervous in Statham's presence. (R. at pg. 111).

29.   Prior to the date that Statham raped Lillian Guernsey, Laura Wickizer, the Country Living Administrator, never advised Mosier Van Wert that Statham had a criminal background or

8

that he had been classified as a violent sexual predator under the Megan's Law. (R. at pgs. 111, 112).

30.  Shirley Sheridan never provided Mosier Van Wert with any information about Daniel Statham's background. (R. at pg. 112).  Moreover, Mosier Van Wert was never advised to pay particular attention to Statham or to monitor the way in which he interacted with other residents. (R. at pg. 112).

31.  Daniel Statham would also follow Monica Rivenburg to the bathroom which made Monica quite nervous. (R. at pg. 113).

32.  Margaret Mosier Van Wert testified that she had seen Statham loose (sic) his temper [with an elderly male resident] on an occasion prior to the assault on Lillian Guernsey. (R. at pg. 114).

34.  It is important to note that Mosier Van Wert testified that she had reservations about being alone at the Country Living Personal Care Home with Statham because he made her nervous. (R. at pg. 115).  Mosier Van Wert testified that Statham would follow her so frequently and so closely that if she were to stop, Statham would run into her. (R. at pg. 115).

35.  Margaret Mosier Van Wert was the only employee on duty on the evening of February 27, 2002.  She indicated that Robert Ball had come downstairs to report that he had heard a strange noise upstairs. (R. at 116). Mosier Van Wert went upstairs to investigate and found that the door to Lillian's room was locked.  (R. at pg. 117).  Mosier Van Wert knocked on Lillian's door and identified herself, indicating that she wanted Lillian to open the door. (R. at pg. 118).  However, Lillian did not come and open the door. (R. at pg. 118). [VanWert could hear faint noises in

9

Plaintiff's room and had a "gut feeling" someone was in the room with Plaintiff.]

36. Mosier Van Wert contacted Laura Wickizer in the hopes that Wickizer would come to the personal care home (R. at pg. 119); however, Wickizer simply advised Mosier Van Wert to get the key and unlock Lillian's door. (R. at pg. 119).

37. Mosier Van Wert went downstairs and retrieved the key; however, when she came back upstairs, Lillian's door was open and her underwear and her pull-up were on the bedroom floor and her bed was, in Mosier Van Wert's words, "a mess." (R. at pgs. 119, 120). At that point in time, Mrs. Guernsey denied that anyone had been in her room. (R. at pg. 120). [Plaintiff did not seem upset.]

38. At approximately 9:00 p.m. Statham admitted to Mosier Van Wert that he did have sex with Lillian and not to tell anybody because if they knew, he would no longer be able to stay at Country Living. (R. at pg. 120).

39. Mosier Van Wert testified that Statham did not let her out of his sight from the time that he admitted what had happened with Mrs. Guernsey. (R. at pg. 120).

41. Mosier Van Wert testified that had she been made aware of Mr. Statham's prior rape conviction, she would have asked to have two people on the shift [one for the residents and one to watch Statham] for her own safety. (R. at pg. 123).

43. Mosier Van Wert testified that she had spoken with Laura Wickizer [after Van Wert left Country Living] about contacting the police relative to what had taken place the prior evening and Wickizer had indicated that she had not contacted the police and that she was waiting for a phone call "back from the bosses." (R. at pg. 125).

10

44. Notwithstanding the fact that the rape had occurred some between 8:00 p.m. and 9:00 p.m. on the evening of February 27, 2002, by 2:00 p.m. the following day [when Van Wert arrived for work] no one from Country Living Personal Care Home had contacted either the police, Dr. Sebastianelli or Tyler Memorial Hospital for purposes of performing an evaluation on Mrs. Guernsey. (R. at pg. 126).

45. Mosier Van Wert indicated that she had expressed concerns about Daniel Statham to Laura Wickizer (R. at pg. 137). Mosier Van Wert indicated to Laura Wickizer that Statham made her nervous and a couple of the other workers nervous and that they were worried. (R. at pg. 137).

46. Elizabeth Hardy was a Nicholson Borough Police Officer in February of 2002 and was contacted by Laura Wickizer when Statham left the facility on February 28, 2002. (R. at pgs. 139-141).

47. Hardy was contacted by Wickizer to secure Hardy's assistance in bringing Statham back to the Country Living Personal Care Home. (R. at pg. 141).

49. Wickizer arrived at the Nicholson Borough Police Station after Hardy's initial encounter with Statham, and at that point Wickizer made the disclosure that she believed that Statham had been involved in a sexual assault on one of the elderly residents at Country Living. (R. at pgs. 143, 144).

50. Initially, Wickizer would not provide Hardy with any information regarding the sexual assault, indicating that she had to speak with Shirley Sheridan first and see if it was ok to report it. (R. at pg. 144).

11

51.  Hardy indicated that after asking her several times, Wickizer finally stated the nature of the incident of the prior evening, and she also advised Hardy that Statham was on probation for an aggravated sexual assault. (R. at pg. 145).

53.  Wickizer advised Hardy that Statham was on probation through Northumberland County under the Megan's Law (R. at pg. 147); Wickizer indicated to Hardy that she was concerned that she would get in trouble about disclosing the information that she had to Hardy because she did not clear it first through Shirley [Sheridan]. (R. at pg. 147).

54.  Wickizer reported to Hardy that Statham had a very bad temper and can be violent at times. (R. at pg. 158, 159).  Hardy reflected these facts in her report. (R. at pg. 159). [See Exs. P-12 and P-13.]

58.  However, there is no dispute in the record that Kamarauskas admitted that Christiano had advised her that Statham had been in jail for a sex related offense. (R. at pg. 164).

59.  It is undisputed that Kamarauskas testified that after she had been provided the information that Statham had been in jail and that he was in jail for a sex related offense, that she spoke with Shirley Sheridan as to whether Statham would be an appropriate candidate to reside at the Omni One Home. (R. at pg. 164).  Kamarauskas indicated that she asked Shirley Sheridan for advice on the placement of Statham at the Omni One Personal Care Home. (R. at pg. 165).

67.  Shirley Sheridan did not ask Linda Kamarauskas to make any additional inquiries or background checks on Daniel Statham prior to Sheridan deciding to transport Mr. Statham to the Country Living Personal Care Home. (R. at pg. 173).

(Doc. 142, pp. 4-14).

12

We also adopt the following Findings of Fact:

71. Shirley Sheridan was the sole shareholder of Country Living Personal Care Home in October of 2001 at the time that Daniel Statham was accepted as a resident. (R. at pg. 187). Shirley Sheridan testified that Country Living Personal Care Home had a duty to oversee things and "try to keep any altercations from happening," including sexual assaults. (R. at pg. 190).

72. Shirley Sheridan admitted that it was her decision to accept Mr. Statham as a resident at Country Living Personal Care Home. (R. at pg. 191).

74. Sheridan admitted that either one or two weeks after Statham's arrival, she was notified by Linda Kamarauskas that Statham had arrived at Omni One in handcuffs. (R. at pg. 195). Sheridan further admitted that Kamarauskas had told her that Statham had been brought by uniform officers in a police car. (R. at pg. 195).

75. Sheridan admitted that in all the years she had worked as a personal care home administrator and owner of personal care homes, that she had never received any other individuals in a police car wearing handcuffs (R. at pg. 195).

76. Sheridan admitted that she did not look into why Statham had been transported to Omni One by law enforcement personnel while wearing handcuffs (R. at pg. 196).

77. It is undisputed that Sheridan admitted that it was very important to find out more about Mr. Statham's background before placing him with elderly residents but that she did not do that at the time she transported him to Country Living (R. at pg. 198).

78. It is undisputed that Shirley Sheridan admitted that it was a "mistake" to accept Daniel Statham (R. at pg. 198).

13

79. Shirley Sheridan admitted that when she took Daniel Statham from the Omni One Personal Care Home to Country Living, she did not look through his Omni One file (R. at pg. 200).

80.  Shirley Sheridan admitted that she had the Order of Court from Northumberland County on Daniel Statham (Identified in the Record as "P10") prior to the rape of Lillian Guernsey (R. at pg. 201).  Moreover, Sheridan admitted that the Order of Court was in the file maintained by Omni and taken by Sheridan at the time she brought Statham to Country Living (R. at pg. 202).

81. Sheridan admitted that had she looked in Statham's file, she would have seen the Order of Court from Northumberland County identifying Statham as a Megan's Law violator (R. at pg. 202).

82. Sheridan admitted that after the Order of Court identifying Statham as a sexual offender was brought to her attention, she did not personally look into the matter, but rather asked Laura Wickizer to do so (R. at pg. 203).  Sheridan explained her failure to do so by indicating she did not have access to a phone at college (R. at pg. 203).

83. Sheridan admitted that after seeing the Order of Court regarding Statham, she assumed he was on probation and that he had been in trouble (R. at pg. 205).

84. Sheridan admitted that she made "several mistakes" with respect to accepting Mr. Statham at Country Living (R. at pg. 207). Sheridan indicated that, "I was going to college full-time. I had several businesses. I had a horrible marriage. I made lots of mistakes." (R. at pg. 208).

85. It is undisputed that Sheridan admitted that she should not have taken Mr. Statham in. She indicated that, "I put myself in danger, I put my staff and the residents in danger.  All of us." (R. at pg. 208).

14

86. Sheridan admitted that if she did not take Statham in, Mrs. Guernsey would not have been raped (R. at pg. 209).

87. When Sheridan was asked about her failure to not get any additional information on Statham and at the same time continued to allow him to live at the personal care home, she admitted that it was "definitely a mistake" (R. at pg. 209).

88. Sheridan admitted that she was told about Mr. Statham following the staff around and that he followed them around and stood outside of the bathroom when staff members were in the bathroom (R. at pg. 212).

89. Sheridan admitted that she spent only approximately five hours per week at the Country Living Personal Care Home during the relevant time-frame (R. at 213).

90. Sheridan admitted that staff members were "very uncomfortable" because Statham followed them (R. at pg. 214).

91. Sheridan admitted that on one occasion prior to the rape, she had to go to the personal care home and pick-up Statham because of an outburst he had when he was mad at Laura Wickizer (R. at pgs. 214, 215). Statham had yelled at Laura and stormed out of the facility (R. at pgs. 214, 215).

92. Sheridan was shown the report of the Pennsylvania State Police concerning the rape in which the statement was attributed to her, "Sheridan indicated in the last few weeks Statham started to change. Statham would become agitated and would leave the facility." (R. at pg. 216).

93. Sheridan admitted that she knew Statham had committed a crime prior to his rape of Lillian Guernsey (R. at pg. 217).

15

94. Sheridan admitted that she knew Statham had been in prison prior to the time that he raped Lillian Guernsey (R. at pg. 219).

95. Upon questioning by her own attorney, Sheridan admitted that she was at fault for the harm that came about to Mrs. Guernsey (R. at pgs. 229, 230).

(Doc. 142, pp. 18-21).

We find Plaintiff's Supplemental Findings of Fact regrading Wickizer's testimony to be credible. (Doc. 142, pp. 27-30, ¶'s 124-140). We thus adopt these proposed findings of fact of Plaintiff as our own and incorporate them herein by reference. (Id.).

We further find:

112. Pennsylvania State Trooper Stephen P. Kelly was the led investigator on the assault on Mrs. Guernsey (P23). Trooper Kelly had someone in his office contact Dr. Sebastianelli in order to have Lillian taken to the hospital so that she could be checked medically for her well-being and also to have a sexual assault kit performed on her. (P23.33, P23.34).

113. On October 21, 2002, Statham entered a plea of guilty to the criminal offense of aggravated indecent assault against Lillian Guernsey. (P23.35).[5]

114. Statham admitted to Trooper Stephen P. Kelly incident to Kelly's investigation that he had had sexual intercourse on two separate occasions with Lillian Guernsey. (P23.36).

(¶'s 112-114, Doc. 124, p. 25).

---

[5]We incorporate by reference the Pennsylvania State Police Report. *See* Plaintiff's Ex. P-15, admitted into evidence. *See also* Sexual Offenders Assessment Report Ex. P-5, dated December 20, 2002, admitted into evidence.

Thus, Statham admitted that he had sexual relations with Plaintiff on two (2) separate occasions. Based on the testimony presented at trial we make the following conclusions of law:

## III. Conclusions of Law.

Defendant Sheridan knew of Statham's sexual offense conviction, that he came from prison, and that he was a Megan's Law violator prior to the rape of Plaintiff. Defendant Sheridan, in her individual capacity, is negligent in accepting Statham as a resident at Country Living on October 26, 2001. All Defendants are negligent in failing to properly supervise Statham, and in failing to adequately protect the other residents, including Plaintiff, from him. All Defendants are vicariously liable for negligence.

Defendant Sheridan was aware of the October 2, 2001 Northumberland County Court Order (Pl. Ex. P-10) regarding Statham and took no precautions in accepting Statham as a resident. Sheridan had about four (4) months to take precautions, from October 26, 2001 to February 27, 2002. Sheridan did not warn her staff about Statham and his past. Sheridan and Country Living did not take proper steps when their staff complained about Statham prior to the rape of Plaintiff. Sheridan did not even tell her Administrator, Laura Wickizer, about Statham and his past until Laura Wickizer saw the Court Order. When Wickizer found out about Statham's past criminal record, she did not advise the staff and take appropriate actions to protect the residents at Country Living. Sheridan did not properly follow up on the Court Order once she saw it in Statham's file. Merely telling Linda Wickizer to call about the Order, as Sheridan testified, and then doing nothing else, was not sufficient to protect the residents and staff at Country Living.

Prior to the rape, Sheridan and Country Living were aware that Statham followed their staff around and waited for them outside of the bathroom. The Defendants knew that Statham had threatened Rivenburg prior to the rape and did nothing about it. The Defendants knew of Statham's conviction prior to the rape. Spickerman, a Country Living staff member, told Sheridan prior to the rape that Statham came up behind her, squeezed her breasts, and kissed her and tried to turn her around, and Defendants did not take proper action after learning this. Defendants did not warn the staff about Statham, they did not increase supervision of Statham and add more night staff, and they did not move Plaintiff's room away from Statham. These failures, despite knowing the risk to residents Statham presented, all constitute negligence on the part of all Defendants, as well as demonstrate reckless indifference by Defendants to the safety and well-being of the residents.

We find that the mentioned disturbing behavior by Statham before the rape, that was detailed by staff to the Defendants, was certainly indicative that Statham should no longer be allowed to live at Defendants' Home, yet nothing was done. We find that Defendants Sheridan and Country Living knew of Statham's past criminal history, that they knew of his temper while at Country Living, and that they knew of his inappropriate behavior with staff, and they knew that their staff was afraid of him. Taking all of this into account, once Spickerman relayed to Defendant Sheridan about the incident when Statham had squeezed her breasts and kissed her, it was wanton conduct and reckless indifference of Defendant Sheridan and Defendant Country Living not to take any action to remove Statham from the Home or to protect the other residents of the Home from Statham, including Plaintiff.

18

Defendants' staff did not contact police after the rape until about 2:30 p.m. on February 28, 2002 (i.e. 18 or 19 hours after the rape) and only after Statham left the home. Wickizer stated that she could not tell police about the assault until Sheridan cleared it. Van Wert, who had direct knowledge of the sexual assault, did not call police immediately after the incident, did not seek medical attention for Plaintiff, and did not even separate Plaintiff from her room on the second floor with Statham on the night in question. Based on this post-rape conduct, we find all Defendants were recklessly indifferent to the safety and well-being of Plaintiff. Defendants intentionally failed to perform the stated acts, which was their duty to the Plaintiff to do. We find that in light of the stated conduct of Defendants, having full knowledge of Statham's past criminal history as well as his conduct while at Defendant's Home, a reasonable person would conclude not only that their conduct created an unreasonable risk of harm to their residents, but also that the risk Statham presented while at their Home was substantially greater than that which was necessary to render their conduct merely negligent.

Both parties also offered expert testimony in an attempt to establish the ability of Plaintiff to realize that she had been raped, and to establish the extent of damages she suffered as a result, both emotional and physical, as well as the long-term effects on her. However, the Court has determined this expert testimony largely to be inconclusive as to any long-term effects on Plaintiff from the rape and, consequently, of little help on this issue since none of the experts could truly say for certain the long-term effects of the rape on Plaintiff due to her then moderate stages of Alzheimer's Disease and now progressed stages. We do, however, find that the experts acknowledged that Plaintiff did experience adverse consequences during the rape and shortly after

19

the rape, and that she wanted to avoid Statham at the lunch table the next day. We accept the

testimony of Dr. Cornacchione that Plaintiff showed signs of short-term memory of the sexual

misconduct. Plaintiff was not her usual self the day after the rape, according to Wickizer and

Rivenburg.[6] This evidence was undisputed. Plaintiff indicated that Statham liked her ass and

wanted her body. While Dr. Cornacchione stated that Plaintiff recognized Statham the day after

the rape, Plaintiff still asked where the dopey man was even though Statham was across from

Plaintiff at the lunch table. Defendants' expert, Dr. Fischbein, also stated that Plaintiff's conduct

the day after the rape regarding the dopey man indicates some level of her memory of the sexual

misconduct. We also take note of the fact that Plaintiff never stated to anyone that she was raped.

Even when Van Wert arrived moments after the incident, Plaintiff did not discuss it. Plaintiff never

discussed the incident with anyone, either while still at Defendants' Home or when she was moved

to the Tennessee nursing home. Plaintiff did recognize her son when he came to pick her up in

June 2002. But she never told her son about the rape when he picked her up in June 2002 and

drove her to Tennessee. Further, we find that once Statham was removed from Defendants' Home,

Plaintiff did not have any recollection of the rape, and that as her Alzheimer's Disease progressed

from moderate stage to advanced, there is no definite testimony or evidence that Plaintiff

experienced any painful recollections of the sexual assault. Thus, we do not find that Plaintiff had

any lasting memories or effects from the rape due to her moderate stages of Alzheimer's Disease.

We find the testimony of Plaintiff's expert, Dr. Cornacchione, that Plaintiff had long-term memory

---

[6]Rivenburg testified that after Statham raped Lillian, she seemed a little more disoriented than usual. (R. at pg. 255). Rivenburg also indicated that before Statham got arrested, Lillian told Statham to get away from her. (R. at pg. 256).

of the rape and may have suffered from long-term effects from the rape, entirely too speculative. We agree with Dr. Fischbein and do not find that Plaintiff suffered any long term effects from the rape or post-traumatic stress syndrome.   There is simply no definitive evidence that, despite Plaintiff's undisputed diminished cognitive abilities due to her moderate Alzheimer's condition, she suffered any lasting emotional distress as a result of the rape.

We find credible the testimony of Dr. Fischbein that Plaintiff, consistent with her moderate Alzheimer's Disease, was not sure what had happened on the night in question and that she could not give Pennsylvania State Police Trooper Kelly an accurate or reliable history of the incident. We find that, as Dr. Fischbien stated, Wickizer noted changes in Plaintiff's condition the day after the rape.   Dr. Fischbein stated that Plaintiff recognized something on February 28, 2002 at the lunch table about Statham, which was triggered by the visual cue of her seeing him, but that thereafter (after the visual cue was removed with Statham's departure) there were no records that Plaintiff suffered further difficulties from the rape.   He stated that, when Plaintiff was taken to Tennessee, there were no records in the nursing home there that Plaintiff was suffering consequences from the rape, and there were no documents that she exhibited behavior consistent with anxiety or trauma from the rape.   He stated that the only definitive behavior showing any signs of trauma by Plaintiff after the rape was at the February 28, 2002 lunch table.   We find Dr. Fischbien's testimony more credible than that of Dr. Cornacchione, to the extent that there is no evidence that Plaintiff had any long-term memory of the rape and that she did not suffer any lasting trauma as a result of it.

We find, based on Dr. Cornacchione's testimony, that the conduct of Defendants in accepting Statham as a resident and in allowing him to remain at the Home despite his known criminal background and his known inappropriate behavior at the Home prior to the rape, constituted a breach of care of Defendants' duty to Plaintiff which proximately caused Plaintiff physical and emotional pain. We find, based on Dr. Cornacchione's testimony, that Defendants' stated conduct, as detailed above, was reckless and wanton.  We find that Defendants' failure to separate Statham from Plaintiff, failure to call police and to keep Statham away from Plaintiff after the sexual incident, of which staff was aware, until it could be investigated, and failure to get medical care for Plaintiff, was wanton behavior, and was done in reckless disregard for Plaintiff's well-being and safety.  In fact, on the night of the incident, after Van Wert became aware of it and told Wickizer about it, Plaintiff was still allowed to stay in her room on the second floor where Statham's room was located.  We find that this conduct was done in reckless indifference to Plaintiff's safety.

However, as stated, we do not find that there is any reliable evidence that Plaintiff suffered any long-term effects from the physical and emotional pain that Defendants' breach of care caused her. We find that the evidence is clear that Plaintiff suffered trauma, both physical and emotional, during and after the rape, but that it was short-term trauma.  We accept Dr. Fischbein's testimony that a few days after the rape and after Statham's removal from the Home, Plaintiff had no recollection of the rape. We also accept Dr. Fischbein's testimony that Plaintiff did not suffer from post-traumatic stress disorder after the rape.  Thus, we do not accept the testimony of Dr. Cornacchione insofar as he stated that Plaintiff may have suffered permanent consequences as a

22

result of the sexual assault.[7]

We also find that Defendants breached their duty of care owed to Plaintiff by not promptly calling the police after Defendants' staff became aware of the sexual misconduct and by not promptly taking Plaintiff to the hospital for a full examination. In fact, according to the uncontested evidence at trial, Defendants' staff only called the police about 2:30 p.m. the day after the rape (February 28, 2002) because Statham left the Home. We find that this conduct was willful and recklessly indifferent to the safety and well being of Plaintiff, for which the Defendants were responsible. In fact, Wickizer admitted at trial that this conduct was simply wrong.

Further, we find credible the testimony of Wickizer that Defendant Sheridan stated "I hope you didn't lose my facility" when Wickizer had finally told Sheridan that Plaintiff was raped by Statham. We find that this statement of Sheridan indicates a consciousness of guilt of improper conduct.

We adopt Plaintiff's proposed Conclusions of Law contained in her supplemental filing, Doc. 142, pp. 38-39, ¶'s 1.-2.) and incorporate them herein. We conclude, as discussed above, consistent with the Plaintiff's expert report of Francis Rose (Exhibit P-2), and the report of Dr. Cornacchione, that Defendants' breaches of duty owed to Plaintiff were wanton, done in reckless indifference to her welfare and safety. In particular, we find that the conduct of Defendant Shirley Sheridan in accepting Statham as a resident in her Home, in allowing Statham to remain in her Home after she became aware of his criminal record, in failing to notify her staff about Statham and

---

[7]As Dr. Fischbein indicated, and as discussed above, there were no records that Plaintiff suffered any adverse emotional stress or trauma from the rape in the Tennessee nursing home records.

to take steps to protect residents from him, and the conduct of all Defendants in allowing Statham's room to be on the second floor near Plaintiff's room, and in failing to take action after staff made Defendants directly aware of Statham's stated inappropriate conduct prior to the rape, including following staff and waiting outside the bathroom and grabbing and kissing Spickerman, constituted not only negligent conduct, but also was wanton conduct. We thus find Defendants' conduct was recklessly indifferent to the safety and well-being of Plaintiff. Based on Plaintiff's age and Alzheimer's Disease, Plaintiff was not capable of protecting herself, and Defendants were directly responsible for bringing a convicted sexual predator into their Home without even taking the slightest precautions to protect the residents and without ever warning their staff about Statham. In fact, as mentioned, Statham was, remarkably, allowed to room on the second floor, where Plaintiff was located, and far removed from the single member of the night staff.

As discussed, we find that the negligence of Defendants was the cause of the harm suffered by Plaintiff and that as a result, Plaintiff was injured. We have found that Defendants owed a duty of care and protection to their residents, including Plaintiff, to prevent harm to them, and that they had a duty to supervise any resident who had a propensity to cause harm to others that was known or that should have been known by Defendants. We have also found that Defendants breached their duty of care owed to Plaintiff with reckless indifference to her safety and well-being, which they were charged with protecting due to her age and mental condition. We thus find, as a matter of law, that Plaintiff has established that Defendant Shirley Sheridan and Defendant Country Living Personal Care Home, Inc. are liable to her for the injuries she sustained as a result of Statham's sexual assault of her, and that she is entitled to both compensatory and punitive damages.

24

Plaintiff has filed this tort cause of action and under 28 U.S.C. § 1332(a)(1).  Jurisdiction is

proper because at the time of filing of this action there existed diversity between the parties.  *See*

*Jones, supra.*

We find that Defendants undisputedly had a duty of care owed toward Plaintiff.  We agree

with Plaintiff (Doc. 142,  45-47) that Defendants were responsible to Plaintiff to the extent of the

statutory requirements provided at 55 Pa. Code §§ 2620.1, *et seq.,* regarding duties of personal

care homes.  As the Court held in *Lebish v. Whitehall Manor Inc.,* 2002 WL 3170745 (Pa. Com. Pl.),

Pennsylvania personal care homes are subject to the administrative regulations found at 55 Pa.

Code § 2620.1-2620.83.  *See also Mohler v. Jeke,* 595 A. 2d 1247, 1250 (Pa. Super. 1991)(personal

care homes are regulated in Pennsylvania by 55 Pa. Code § 2620,  *et seq.*).

The Court in *Jadwiga Ruta, Guardian and Magdalena Kalinowski v. Ivy Ridge Personal Care*

*Center, Inc.,* 1995 WL 1315960 (Pa.Com.Pl. 1995), stated as follows:

> It is settled that in any given situation, the existence of a duty
> is predicated on a relationship existing at the time in question,
> *Dumanski v. City of Erie,* 348 Pa. 505, 507, 34 A.2d 508, 509 (1943)
>  and requires some degree of knowledge. *Morena v. South Hills*
> *Health System,* 501 Pa. 634, 462 A.2d 680 (1983). Relationships
> between parties may be established by statute. *See Mohler v. Jeke,*
> 407 Pa.Super. 478, 595 A.2d 1247 (1991) (noting that personal
> care homes are regulated by the Commonwealth in Title 55,
> § 2620 *et seq.* and noting that defendants could have liabilities
> towards others based on noncompliance).
>
> As Defendants argued, 55 Pa. C.S.A. §2620.1 *et seq.* applied to
> the parties in the instant case. *Id.* This statute mandated that
> personal care homes provide certain services to residents and
> follow certain procedures. The purpose of the statute was to assure
> that personal care homes provide safe, humane, comfortable
> and supportive residential settings for aged, blind, and disabled, and
> other dependent adults who require assistance beyond the basic

necessities of food and shelter but who do not need hospitalization of skilled or intermediate nursing care.' 55 Pa. C.S.A. §2620.1 (1981). The statue provided in part that personal care homes:

1. shall provide personal care services 'by trained, qualified staff persons and with ongoing oversight and general supervision of residents' care by the administrator. A resident in need of services that are beyond services available in the home in which he resides shall be referred to the appropriate assessment agency.' ' *Id.* §2620.31;

'2. shall assist residents as needed with personal hygiene.' *Id.* §2620.32; and

'3. shall assist residents as needed with tasks of daily living such as securing health care and eating.' *Id.* §2620.33.

Additionally, 'if a resident suddenly becomes ill or injured and is unable to secure necessary care, the administrator or designee shall secure necessary assistance or care. Arrangements shall be made in advance between the administrator or a designee and the resident regarding the physician or dentist and designated person or community agency to be contacted, in case of illness or injury, and those persons shall be contacted.' *Id.*§2620.38.

We find in our case, based on the relationship between Plaintiff and Defendants, Defendants' conduct toward Plaintiff was governed by 55 Pa. Code § 2620.1, *et seq.* Under these statutory provisions, we find that Plaintiff presented more than ample evidence that both Defendants had a duty to protect her safety and well-being, and a duty of supervision over Statham, and that both Defendants breached these duties.[8] We also agree with Plaintiff that Defendants failed to comply with the Administrative regulations specified in her Supplemental Findings of Fact, Doc. 142, pp. 45-47. We further find that the detailed actions of the Defendants in our case were

---

[8]Statham's conduct at Country Living Home prior to the rape of Plaintiff clearly showed that additional staffing, especially at night, was required to protect the safety and well-being of the residents. Additionally, Defendants' staff testified that if they were informed of Statham's background, they would have requested additional staffing to supervise him.

unreasonable and exposed Plaintiff to a substantial risk of foreseeable harm.  We find that

Defendants failed to act reasonably to prevent the rape incident and that they failed to act

reasonably after the rape occurred.

We thus find that Defendants violated their duty of care owed to Plaintiff under 55 Pa.

Administrative Code §§ 2620.1, et seq.,[9] including §§ 2621.21, 2720.27(2), 2620.31, 2620.38(a),

2620.61(10), and 2620.61(11).  (See Doc. 142, pp. 45-47).[10]

On October 26, 2001, Defendant Sheridan accepted Statham to live as a resident at Country

Living.  Plaintiff was already a resident there.  Thus, Plaintiff was clearly entrusted to the care of

Defendants based on her age and Alzheimer's condition, and she should have been afforded all of

the protection which the laws of the Commonwealth of Pennsylvania afford to personal care home

---

[9]The Pennsylvania Department of Public Welfare adopted Chapter 2600 relating to personal care homes and rescinded Chapter 2620 after the relevant time of our case.  We therefore refer to Chapter 2620, et seq., since this Chapter contained  the duties owed by a personal care home to a resident at the time in question.

[10]We note that we rely upon Plaintiff's uncontested references in her Supplemental Findings (Doc. 142, pp. 45-47) to the Pa. Code and the applicable sections cited therein.  We also note that the revised Pa. Code, 55 Pa. Code §§ 2600, et seq., contains substantially the same requirements as were contained in Chapter 2620, including § 2600.15 (abuse reporting); § 2600.16 (reportable incidents), 2600.18 (compliance with applicable laws and regulations); § 2600.22 (relating to reportable incidents); § 2600.42(b) (specific rights, i.e. a resident may not be neglected, intimidated, physically or verbally abused, mistreated, and (s) right of privacy); § 2600.43(a) (non-deprivation of rights); § 2600.53(c) and (f) (administrator responsible for health, safety and well-being of residents and to comply with applicable laws and regulations); § 2600.60 (additional staffing to protect health, safety and well-being of residents); § 2600.65(b)(4) (staff training regarding reporting reportable incidents); §2600.141(b)(2) (medical evaluation if a medical condition changes); § 2600.201 (safe management techniques); § 2600.224 (pre-admission screening); and § 2600.225 (initial/annual assessment).

residents. *See* 55 Pa. Code § 2600.18. Accordingly, the Defendants owed Plaintiff a duty to protect her safety and well-being and to exercise reasonable care by preventing harm to her. We also find that Defendants knew or should have known that Statham was not an appropriate resident at the Country Living Home, and after they became aware of his criminal past, they should have removed him from the Home forthwith.

We find that Plaintiff's evidence has shown that Defendant Sheridan was aware of the Northumberland County Court's Order of October 2, 2001 (P-10) regarding Statham and that, despite having actual notice of the Order, Defendant Sheridan did not take adequate steps to inquire about it and follow up as to the appropriateness of Statham's living at Defendants' Home. We find that Defendants should have, through reasonable inspection, discovered that Statham was a sexual predator, convicted of sexual assault, who maxed out on his six-year sentence, was a Megan's Law violator and, therefore was not an appropriate resident at the Home. We find that it was a breach of duty of care Defendants owed to Plaintiff to accept Statham as a resident and to allow him to remain there when they discovered his criminal past. It was then a further breach of care by Defendants to fail to warn their staff about Statham and to take precautions to prevent him from harming staff and the residents. It was a breach of duty of care by Defendants to allow Statham to remain at their Home after discovering his criminal past, and after their own staff told them about Statham's troubling behavior while at their Home. Therefore, we find that Defendants did have actual notice of Statham's criminal past and of his propensity for sexual misconduct well before the rape occurred, and that they should have taken the necessary steps to protect the residents at Country Living, and their staff, from such known danger which Statham presented.

Thus, Plaintiff, through the testimony and reports of her experts, has clearly established Defendants' breach of duty of care owed to Plaintiff and that this breach of care caused Plaintiff to have suffered harm. However, as discussed, we do not find that Plaintiff has established through her experts that she suffered any permanent or long-term harm or trauma as a result of the rape. While Dr. Cornacchione testified that Plaintiff suffered long-term effects from the rape, this testimony was rebutted by Defendant's expert, Dr. Fischbein. We find Dr. Fischbein's testimony that Plaintiff suffered only short-term effects from the rape to be more convincing and credible. While Plaintiff was agitated on the day following the rape, once Statham was removed from the Home, there is no conclusive evidence that shows Plaintiff suffered any further effects from the rape. Even though Plaintiff's overall condition deteriorated thereafter, the Defendant's expert brought to light possible circumstances other than the rape which suggested that Plaintiff's condition changed due to medicine modifications, further progression of her Alzheimer's disease, and the changes in her environment.

The expert testimony presented by both parities has proven to be of little help in determining the duration of the suffering Plaintiff endured after the rape. What is undisputedly known, however, is that the day after the rape, Plaintiff's condition was changed, and she clearly had recollections of Statham associated with improper sexual conduct. Wickizer's report on the day after evidences this, and Rivenburg's testimony substantiates this evidence. Dr. Fischbein acknowledged this behavior of Plaintiff, but stated that it was short-lived once the visual cue of Statham's presence at the Home was removed. We also find that, in light of the undisputed statement of Statham to Trooper Kelly regarding the torrid and repulsive details of the rape (*See* Ex.

P-15), and Statham's admission that he had sexually assaulted Plaintiff twice, Plaintiff suffered both physical and emotional harm during the rape and for a time after the rape.  However, due to her undisputed moderate Alzheimer's condition, as well as her age, her recollection of the rape and its effects on her were limited to a short time thereafter, *i.e.* a few days.

Plaintiff has shown that Statham's presence at the Home presented a danger to Plaintiff, as well as all of the residents and staff, which was known to Defendants, and they should have taken precautions to protect the residents whose care and well-being they were entrusted to protect.  We adopt the Pennsylvania Code, as Plaintiff has proposed, Doc. 142, pp. 45-47.  We find that Statham presented a danger which was known to Defendants well before the rape.   Therefore, we determine that Statham presented a danger to Plaintiff which was known to Defendant Sheridan, and that Defendant Sheridan and Defendant Country Living did not take adequate steps to enure Plaintiff's safety and well-being, which Defendants were obliged to do, from the known harm that Statham presented to her.  Defendants are thus liable to Plaintiff and for the harm she suffered from the rape.

## IV. Damages

We find in favor of the Plaintiff on liability.  Since the rape undisputedly caused Plaintiff injuries, Plaintiff is entitled to damages for pain and suffering, both physical and emotional.[11] Plaintiff's Exhibit 15.6, the Pennsylvania State Police Report with Statham's statement about the rape, indicated that the assault lasted 30 minutes and that he ejaculated in her.  Statham stated that

---

[11]Since Plaintiff was not employed at the time of the rape, there is no claim for lost wages.   Further, there is no claim for medical expenses for treatment of Plaintiff after the rape.

Plaintiff's legs were on his shoulders.  However, Plaintiff did not describe pain immediately after

the assault when Van Wert arrived at her room.  Plaintiff did not show signs of agitation and anger,

nor did she appear to be horrified on the night of the rape directly thereafter.  Dr. Fischbein stated

that Plaintiff had the ability at the time to cry and scream, and could say if things hurt, but she did

not say she was in pain immediately after the rape.  We find Plaintiff's evidence and testimony that

Plaintiff has suffered harm from the rape as credible, but accept the testimony of Defendant's

expert that she did not continue to experience any lasting pain, and that she did not have

continuing suffering or trauma.  Dr. Fischbein stated that once Statham was gone from the Home,

Plaintiff's condition returned to her baseline and her prognosis was good.  He stated that Plaintiff

was only experiencing stress from the rape while the visual cue of the rape, *i.e.* Statham, was at the

Home, and that once Statham left the Home, Plaintiff's condition returned to her pre-rape

condition.  We find no evidence that contradicts Dr. Fischbein's testimony.  Wickizer's report the

day after the rape indicates a marked change in Plaintiff's behavior, but after Statham left the

Home, there are no further similar reports.  We find Dr. Fischbein's testimony that after Statham

was removed form the Home, and the visual cue was gone, Plaintiff had no further recognition of

the rape.   While Dr. Cornacchione stated that Plaintiff needed psychotropic medicine due to the

rape, Dr. Fischbein stated that Plaintiff was already on such medicine prior to the rape.  Nor do we

find that Plaintiff's treating doctor, Dr. Sebastianelli, noted any marked changes in Plaintiff's

condition after the rape.  Further evidence is the fact that Plaintiff did not treat with medical and

psychological professionals for any time after the rape.[12]  Plaintiff did not receive any psychological

counseling after the rape.  Finally, Dr. Fischbein stated that Plaintiff, in her present advanced stages

of Alzheimer's, has no painful recollection of the rape.  As stated above, we also find Dr. Fischbein's

testimony credible that Plaintiff did not suffer from post-traumatic stress disorder after the rape.

### 1.  Compensatory Damages

Dr. Fischbein found no objective medical evidence, based on his review of the records, that

the Plaintiff suffered any long-term or permanent injuries, either physical or emotional, from the

rape.  However, we accept Statham's uncontested graphic statement regarding the 30-minute rape

of Plaintiff and that it was the second occasion, which was bolstered by Dr. Cornacchione's stated

opinion that Plaintiff suffered physical and emotional pain from the rape.  For injuries sustained and

for pain and suffering, the Court awards Plaintiff $300,000.

### 2.  Punitive Damages

As the Court stated in *McCain v. Beverly Health and Rehb. Services, Inc.*, 2002 WL 1565526

* 2 (E.D. Pa.), "[i]n Pennsylvania, punitive damages require 'wilful or wanton conduct or reckless

indifference to the rights of others.' 40 P.S. § 1301.812-A(a)."

---

[12] Dr. Fischbein stated that Plaintiff's Tennessee nursing home records do not show she suffered any difficulties from the rape.  He stated that there were no records in the Tennessee home regarding consequences Plaintiff suffered from the rape, such as that she was afraid of males in the Home.  We find credible Dr. Fischbein's testimony that there is no documentation, other than the Wickizer report the day after the rape, that Plaintiff exhibited any behavior consistent with anxiety or trauma from the rape.

Further, the Court in *Wilson v. Chestnut Hill Healthcare*, 2002 WL 199706 * 6 (E.D. Pa.),

stated as follows:

> Under Pennsylvania l aw, "[p]unitive damages are appropriate when an
> individual's actions are of such an outrageous nature as to demonstrate
> intentional, willful, wanton, or reckless conduct." *Interact Accessories,
> Inc. v. Video Trade Int'l, Ltd.*, No. CIV.A.98-2430, 1999 WL 159883,
> at *3 (E.D. Pa. Mar. 22, 1999) (quoting *Bannar v. Miller*, 701 A.2d
> 232, 242 (1997)). Punitive damages are only available in matters
> where "the actor knows, or has reason to know . . . of the facts
> which create a high degree of risk or physical harm to another, and
> deliberately proceeds to act, or to fail to act, in conscious disregard of,
> or indifference to that risk," and not in matters involving simple
> negligence. *Interact*, 1999 WL 159883, at *3.
>
> An "essential fact" needed to support a claim for punitive damages
> is that the defendant's conduct must have been outrageous.
> *Brownawell v. Bryan*, 40 Pa.D. & C.3d 604 (1985). Outrageous
> conduct is an "act done with a bad motive or with reckless
> indifference to the interests of others." *Focht v. Rabada*,
> 217 Pa.Super. 35, 38 (1970) (citing comment (b) to § 908 of the
> Restatement of Torts). "Reckless indifference to the interests
> of others" of an unreasonable character in disregard of a risk known
> to him or so obvious that he must be taken to have been aware
> of it, and so great as to make it highly probable that harm would
> follow." *Evans v. Philadelphia Transp. Co.*, 418 Pa. 567, 574 (1965).
> Simply pleading outrageous conduct does not satisfy the
> requirement of stating facts which, if proven, would form a
> basis for a jury concluding that the conduct was such that
> an award for punitive damages was warranted. *Brownawell*,
> 40 Pa.D. & C.3d at 604.

We have found, as discussed above, that the conduct of Defendant Sheridan and Defendant

Country Living in this case was wanton and recklessly indifferent to the safety and well-being of

Plaintiff. We have based this finding on several pieces of credible evidence, which we will not now

repeat. Suffice to say that we find credible the testimony of Dr. Cornacchione that Defendants

breached the standard of care owed to Plaintiff for several reasons, including the decision to accept

33

Statham as a resident at Country Living even though he was not a suitable resident and in allowing

him to stay after Defendants became aware of his past criminal record, in failing to adequately

supervise Statham at the Home, in placing Statham's room near Plaintiff's room on the second floor

of the Home, and in failing to call the police and take Plaintiff for medical attention immediately

after the rape.   We further find that the conduct of Defendants was wanton and recklessly

indifferent to the safety and well-being of Plaintiff based on the failure of Defendants to properly

pursue the October 2, 2001 Court Order regarding Statham indicating that he was on probation

for a sex offense, and for failing to advise their staff about it and for failing to take precautions to

safeguard the residents from Statham.  Additionally, based on Defendants' knowledge of Statham's

inappropriate behavior and conduct while he was a resident at Country Living, such as following

staff and waiting outside of the bathroom while staff was in it, threatening staff, grabbing and kissing

staff on one occasion, and for failing to remove Statham from the Home or even addressing the

safety concerns he created by his known behavior well before the rape, we find that Defendants'

conduct was wanton.  Finally, based on the conduct of the Country Living staff after the rape, in

that the police were not called and staff had to wait until Defendant Sheridan was notified to call

police, in that Plaintiff was not taken to the hospital and no doctor was called, in that Statham was

allowed to stay in his room near Plaintiff's room on the second floor on the night of the rape with

no further supervision, we find that Defendants' conduct was wanton.

Defendants have attempted to mitigate punitive damages by showing the negligent conduct

of the Northumberland County Probation Department in failing to properly place Statham in a

resident after his release from prison on the Megan's Law violation, in failing to supervise him after

his release, and in failing to review their files to check up on Statham or to coordinate his follow-up with authorities in Lackawanna County.   However, we find that the wanton and recklessly indifferent conduct of Defendants in this case all occurred notwithstanding the undisputed failures of the Northumberland County Probation Office. This wanton behavior of Defendants began when they accepted Statham as a resident at Country Living on October 26, 2001.  Within weeks, Statham left the Home, and after Sheridan brought him back, Wickizer looked in Statham's file and found the October 2, 2001 Order of Northumberland County Court (Ex. P-10) which stated "Registration of Sexual Officer (sic)," and which from she said she could tell Statham was on probation. Wickizer told Sheridan about the Order, and Sheridan replied that she knew about it and knew that Statham had served jail time. Wickizer stated that prior to this, Sheridan did not tell her that Statham had served jail time, and that she would have wanted to know this information for the safety of the other residents and staff.  Wickizer then stated that Sheridan did not ask her to follow up on Statham with the Northumberland County Probation Office. Wickizer said she told Sheridan that Statham had to register with Megan's Law as a sex offender, and Wickizer tried to contact Northumberland County to see if Statham had a probation officer. Wickizer states that the County gave her the run-around and hung up on her. Wickizer then told Sheridan about how she tried to contact the County, and Sheridan did not say that she would contact the Probation Department. We find Wickizer's testimony to be credible. We thus find that, despite the failure of Northumberland County to properly supervise Statham after his release from the County Jail, Sheridan, the Country Living Administrator, and Defendant Country Living had full knowledge of Statham's past and his propensities, and they had ample time to take precautions to protect their

35

residents from him until he could be relocated to an appropriate facility to live. Yet Defendants did

nothing. Again, after Defendants were made aware of Statham's inappropriate conduct while living

at Country Living, well before the rape of Plaintiff, Defendants did nothing to protect their residents

and remove Statham. Finally, after the rape, Country Living did nothing until about 2:30 p.m. the

next day, when Statham left the Home.

Based on the stated first two instances of wanton conduct by Defendants which occurred

before the rape and which we find would have prevented the rape if proper steps were taken to

ensure Plaintiff's safety, we shall award $375,000 in punitive damages per each incident, for a total

of $750,000. For the third instance of wanton conduct in failing to take immediate action after

Defendants became aware of the rape, we shall award $50,000 in punitive damages. Thus, the

total award for punitive damages against all Defendants shall be $800,000.

As this Court stated in *Patel v. Himalayan Intern. Inst. of Yoga Science and Phil.*, 1999 WL

33747891 (M.D. Pa.), punitive damages are designed to punish and to deter. The factors which

the Court considers in assessing the reasonableness of punitive damages are as follows:

> The Court has identified three "guideposts" by which to assess
> the reasonableness of a punitive damages award: (1) the degree
> of reprehensibility of the defendants' actions; (2) the relationship
> of the amount of punitive damages awarded to the actual or
> potential harm; and (3) the difference between the punitive damage
> award and civil penalties that may be authorized or imposed in
> comparable cases. *BMW of North America Inc. v. Gore*, 517 U.S. 559,
> 574-75, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996).

*Patel* at 17.

In our case, as thoroughly discussed, we find the Defendants' conduct utterly reprehensible.

As we live in an age when people are living longer than ever before, we must be able to trust in the

36

persons we allow to care for our elderly and in their obligation to ensure the well-being and safety of our elderly.   Our elderly have earned the right to be cared for as they have cared for us. Defendants' conduct in our case would seemingly be regarded as breaching the standard of care of a personal home in all states.  The evidence is that Statham sexually assaulted Plaintiff on two (2) occasions, and our Plaintiff was the most vulnerable victim that we can imagine.  Since we have found that both Defendant Sheridan and Defendant Country Living Home are directly and vicariously liable to Plaintiff for punitive damages, we have applied the stated factors as to both of these Defendants.  We find Defendants' conduct is indefensible.  They violated the trust which Mr. Itterly placed in them to care for his mother and her well-being.  In fact, Statham's conduct for several months at Country Living, after Defendants were well aware of his criminal past, should have caused Defendants to have him removed from the Home or, at the very minimum, should have caused them to increase their supervision over him and to move Plaintiff's room away from him.  Yet Defendants turned a blind eye to Statham's known inappropriate behavior time and time again.  We find that, in light of the fact that Statham then directed his sexual misconduct at a completely vulnerable victim, an 86-year-old woman with moderate Alzheimer's Disease, who depended entirely on Defendants, both Sheridan and Country Living Home, to care for her well-being, the reprehensibility of Defendants' conduct is extreme.  Even after the rape, which was entirely avoidable, Defendants failed to take proper action.  This conduct is no less reprehensible. Judgment will therefore be entered in favor of the Plaintiff and against all of the Defendants in the

sum of $300,000 for compensatory damages, and in the sum of $800,000.00 against all of the

Defendants for punitive damages.

An appropriate Order and Judgment follows.


s/ Thomas M. Blewitt
**THOMAS M. BLEWITT**
**United States Magistrate Judge**

**Dated: May 19, 2006**

38